UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

SANDRA ARBELLO,

                              Plaintiff,                    **MEMORANDUM & ORDER**
                                                            18-CV-0982 (MKB)

                    v.


COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Sandra Arbelo, proceeding *pro se*, commenced the above-captioned action

pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social

Security (the "Commissioner") denying her claim for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under the Social Security Act (the "SSA"). (Compl.,

Docket Entry No. 1.) The Commissioner moves for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure, arguing that the decision of Administrative Law

Judge Laura Michalec Olszewski (the "ALJ") is supported by substantial evidence and should be

affirmed. (Comm'r Mot. for J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 13;

Comm'r Mem. in Supp. of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 14.) Plaintiff

opposes the Commissioner's motion, arguing that she is disabled. (Pl. Affirmation in Opp'n to

Comm'r Mot. ("Pl. Mem."), Docket Entry No. 16.) For the reasons discussed below, the Court

grants the Commissioner's motion for judgment on the pleadings.

# I. Background

Plaintiff was born in 1973 and has a ninth-grade education. (Certified Admin. Record ("R.") 50, 97, 216, Docket Entry No. 9.) On October 17, 2014, Plaintiff applied for DIB and SSI, stating that she has been disabled since July 30, 2014 due to lupus. (R. 178, 182.) On December 8, 2014, the Social Security Administration issued a decision denying Plaintiff's application. (R. 96–104.) Plaintiff subsequently requested a hearing before an administrative law judge, (R. 111–12), which occurred on November 28, 2016, (R. 38–95). By decision dated February 27, 2017, the ALJ found that Plaintiff was not disabled. (R. 11–31.) On December 4, 2017, the Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision. (R. 3–7.) Plaintiff filed a timely appeal with the Court. (Compl.)

## a. Hearing before the ALJ

Plaintiff appeared at the November 28, 2016 administrative hearing with counsel. (R. 40.) The ALJ heard testimony from Plaintiff, with the assistance of a Spanish interpreter,[1] and Mary Vasishth, a vocational expert. (R. 38–95.)

### i. Plaintiff's testimony

Plaintiff lives in an apartment with her four children and relies on her eldest daughter, aged 21, for financial support. (R. 51–52.) Plaintiff also receives public assistance. (R. 53.) Plaintiff last worked four months prior to the administrative hearing, as a waitress. (R. 55.) Plaintiff worked as a waitress for one year, and at times worked up to thirty-two hours per week.[2]

---

[1] Although Plaintiff testified with the assistance of a Spanish interpreter, the ALJ noted on the record that Plaintiff "answer[ed] in English, and that she was consistently responding prior to the interpreter interpreting in Spanish." (R. 93.)

[2] Although Plaintiff testified that she worked up to thirty-two hours a week, (R. 55–56), in a post-hearing statement, Plaintiff indicated that she worked "four days a week coming in at 9[:00] AM and sometimes leaving at 2[:00] PM because of her illness," and only occasionally

(R. 55–56.)  Towards the end of her employment, Plaintiff's working hours were gradually

reduced.  (R. 70–71.)  Plaintiff believes that her hours were reduced because her employer "no

longer wanted [her] to be there," (R. 71), and fired her because she was "unable to work or to

handle it," (R. 69).  Plaintiff was unable to do the same amount of work as other waitresses

because "[her] body would get slow, and sometimes [her] hands . . . would get swollen and [she]

would drop [things]."  (R. 71.)  Plaintiff's boss knew of her illness and assigned her to perform

other tasks such as slicing tomatoes, but Plaintiff was also unable to successfully complete these

alternative tasks.  (R. 70.)  Prior to working as a waitress, Plaintiff cleaned apartments.  (R. 71.)

Plaintiff has also worked as a babysitter, house cleaner, factory packer, and hair washer at a

salon.  (R. 65–66.)  Plaintiff has "always worked," but after she was terminated from her

waitressing position, she got sick in July of 2015, and did not work for four months.  (R. 71.)

The ALJ asked Plaintiff if she stopped working in July of 2015 "because [she was] sick, or

because [she] couldn't find a job," (R. 72), and Plaintiff testified that she stopped working

because she was sick, (R. 72).  She later clarified that she did not work for four months in July of

2014, after she was hospitalized at Bellevue Hospital Center ("Bellevue").[3]  (R. 73.)

On two occasions in 2014, Plaintiff was hospitalized at Bellevue.  (R. 72–73.)  During

one of her hospitalizations, Plaintiff weighed eighty pounds, lost her hair, and was not able to

work.  (R. 73.)  Plaintiff testified that she has not recovered from her 2014 hospitalizations.  (R.

---

worked a whole shift until 5:00 PM.  (R. 23.)  The ALJ noted in her decision that although
Plaintiff indicated that she was confused, "the record reflects that she understood the questions
posed and her answers were clear."  (R. 29.)  Despite the change in Plaintiff's testimony, the ALJ
found that Plaintiff's testimony and her post-hearing statement consistently reflect that she
worked "multiple hours on multiple days."  (R. 29.)

[3]  Plaintiff first testified that she was sick with lupus while working as a waitress and that
after she was terminated from her waitressing position in 2015, she became too sick to work.  (R.
71.)  When asked about her hospitalizations at Bellevue, Plaintiff later clarified that she was too
sick to work in July of 2014 after she was hospitalized.  (R. 73.)

73.)  She experiences more pain than she did previously and has gained significant weight.  (R. 73.)  Plaintiff experiences generalized pain throughout her body during the day, including headaches.  (R. 77.)  She also experiences significant issues with her hands due to lupus.  (R. 81.)  Plaintiff's hands often swell which makes it difficult for her to dress, bathe, and use the telephone.  (R. 81.)  Plaintiff seeks treatment for her lupus from Dr. Ezra Sharon.  (R. 76.)  She testified that Dr. Sharon treats her with "hot water," (R. 75), and gives her an injection in her elbow every month, (R. 76–77.)  Plaintiff also takes antidepressants and receives counseling.  (R. 75–76.)  Plaintiff's prescribed medication has helped her "calm down."  (R. 76.)

At home, Plaintiff engages in tasks such as sweeping and washing dishes, but she is unable to cook, mop, or do laundry because of pain in her arm.  (R. 67–68.)  Plaintiff takes public transportation once a week and walks if she needs to go somewhere.  (R. 53.)  She does not shop because she becomes fatigued.  (R. 68.)  Plaintiff can only walk one block before she has to take a break and can only stand for twenty consecutive minutes and sit comfortably for thirty minutes.  (R. 80–81.)  Generally, Plaintiff has low energy and feels pain when she is seated for a long period of time.  (R. 74.)  Plaintiff can "sometimes" lift a quart of milk, however "sometimes [she may] drop it."  (R. 78.)

### ii.  Vocational expert testimony

Mary Vasishth, the vocational expert, testified at the hearing after reviewing Plaintiff's work history and listening to Plaintiff's testimony.  (R. 82–91.)  Vasishth classified Plaintiff's waitress work as light exertional work, semiskilled with a specific vocational preparation ("SVP") of three.  (R. 84.)  Vasishth also classified Plaintiff's work as a house cleaner as heavy unskilled work with an SVP of 2.  (R. 85.)

The ALJ asked Vasishth to assume a hypothetical individual that "can work at all exertional levels," in a "low-stress environment defined as occasional use of judgment,

occasional decision making and occasional changes in the work setting." (R. 85.) The ALJ noted that the hypothetical individual "should be limited to simple, routine and repetitive tasks." (R. 85.) Vasishth opined that such a person could perform jobs such as a hand packager, cleaner, and housekeeper. (R. 85–86.) The ALJ then asked Vasishth to assume a hypothetical claimant with the same mental restriction, but with the following limitations:

> The individual can work at the light exertional level and that they can lift and/or carry 20 pounds occasionally, ten pounds frequently. They can sit for six hours in an eight-hour workday, stand or walk for six hours in an eight-hour workday. The individual can occasionally climb ramps and stairs but should never climb ladders and scaffolds. They can occasionally balance and stoop. They should never kneel, crouch and crawl

(the "second hypothetical claimant"). (R. 86.) Vasishth opined that such a person could not perform Plaintiff's past jobs, but could work as a price marker, non-government mail clerk, and assembler of plastic products. (R. 87–88.)

The ALJ also asked Vasishth to assume a hypothetical claimant with the same restrictions as the ALJ's second hypothetical claimant but limited to sedentary work. (R. 88.) Vasishth opined that there were no jobs available for this hypothetical claimant if the individual had a language restriction. (R. 88.) The ALJ further asked Vasishth to assume the same hypothetical claimant without language barriers, but with a limitation of occasional interaction with the public. (R. 89.) Vasishth testified that such a person could work as an addressing clerk, a surveillance system monitor, and a final assembler in optical. (R. 88–89.) The ALJ asked if these positions were suitable for an individual who could occasionally write in English. (R. 90.) Vasishth testified that the "surveillance system monitor requires occasional written and verbal usage and the final assembler would have no problems," however, the "addressing clerk would be eliminated." (R. 90.) Vasishth testified that the jobs she identified in response to the ALJ's first two hypotheticals would still be available with this restriction. (R. 90.)

### b. Medical evidence

#### i. Physical impairments

##### 1. Bellevue Hospital Center

On July 21, 2014, Plaintiff presented to Bellevue complaining that she was in "unbearable joint pain." (R. 294.) Plaintiff reported "that she was unable to walk and had to bend forward when walking due to discomfort." (R. 294.) She also reported that her symptoms began a month prior, but despite the pain, she travelled on vacation to Puerto Rico, (R. 411), where she received a blood transfusion for her pain, (R. 411, 294). Plaintiff indicated that this briefly made her feel better, but shortly thereafter, she continued to have a feeling of malaise, and she experienced decreased appetite and weight loss. (R. 294.) An evaluation conducted by an attending physician reflects that Plaintiff "appeared very ill and was unable to open her eyes," and had "diffuse pain and appeared uncomfortable," but was not in any "acute distress." (R. 295.) On July 23 and 25, 2014, Plaintiff indicated that she was feeling fine, but noted that she was still experiencing night sweats. (R. 442.) Notes from a physical examination conducted on July 26, 2014, reveal that Plaintiff had no swelling and full range of motion in her hands, wrists, elbows, shoulders, knees, ankles, and feet. (R. 455–56.) Physicians at Bellevue administered a chest computerized tomography ("CT") scan, an auto-immune serology, and other "labs [upon Plaintiff's] presentation" to the hospital, and Plaintiff learned that her lab results were abnormal and that she might have lupus. (R. 295.) Plaintiff was discharged on July 30, 2014. (R. 295.) Her discharge summary indicates that she was stable and had no pain. (R. 296.)

On August 20, 2014, Plaintiff presented to Bellevue complaining of weakness, decreased appetite, night sweats, malaise, and a cough. (R. 304.) Examination notes from Plaintiff's visit indicate that she had a decreased mandibular or jaw sensation, a swollen neck, and a hoarse voice. (R. 316.) Plaintiff was admitted and treated with medication over the course of several

days.  (R. 304–08.)  Plaintiff's discharge summary indicates that she had no swelling and that her pain was well controlled.  (R. 308.)

Plaintiff returned to Bellevue on September 4, 2014, and complained of pain in her elbows, wrists, metacarpophalangeal joints ("MCPs"), proximal interphalangeal joints ("PIPs"), hips, knees, and ankles.  (R. 434.)  Dr. Rabi Upadhyay, the attending physician, noted that Plaintiff had been referred to a rheumatologist, but had not sought treatment because she reported that she was unable to "ambulate due to her joint pain" and there were issues with her paperwork.  (R. 435.)  He also noted that Plaintiff was "lying still in bed due to pain with movement," and that her right knee and right ankle had significant swelling.  (R. 435–36.)  Dr. Upadhyay reported that all of Plaintiff's joints in all extremities were very tender to movement and palpation, which he noted was consistent with a lupus flare.  (R. 436–37.)

On September 6, 2014, Plaintiff presented to Bellevue due to a lupus flare.  (R. 293.)  An evaluation conducted by an attending physician reflects that Plaintiff had "diffuse joint aches" in her hands, elbows, shoulder, knees, and ankles, which impacted her ability to ambulate.  (R. 342.)  Plaintiff was able to walk independently and was free from pain when she was discharged on September 7, 2014.  (R. 355.)  The attending physician noted that prior to her discharge she was able to sit up and greet visitors and that Plaintiff "report[ed] significant improvement in symptoms since admission."  (R. 442.)  Plaintiff was seen by a rheumatologist and she was prescribed Prednisone, to which she had a positive response.  (R. 443.)

On October 17, 2014, Plaintiff went to the emergency department at Bellevue.  (R. 403.)  Dr. Jason Kearney, the emergency room attending physician, noted that Plaintiff "present[ed] with sore throat and swelling around her throat," and indicated that her throat hurt "worse when she swallows."  (R. 404.)  X-rays of Plaintiff's neck showed "soft tissue swelling of the epiglottis," but the "soft tissue[was] otherwise unremarkable."  (R. 370.)  Dr. Kearney noted that

Plaintiff's condition was improving but she still had difficulty swallowing. (R. 405.) Plaintiff was discharged the same day of admission and was encouraged to make an appointment at the Bellevue Lupus Clinic following her visit. (R. 406.)

### 2. Dr. Aaron Garza Romero

On September 9, 2014, Plaintiff was seen by Dr. Aaron Garza Romero at the Bellevue Lupus Clinic. (R. 444–48.) Dr. Romero reported that Plaintiff was "asymptomatic," and noted that she had "pain and swelling on dorsal aspect of [her] r[ight] hand likely due to trauma from blood draws while [in] inpatient [care]." (R. 446.) Dr. Romero's physical examination of Plaintiff reflected no swelling, and full range of motion of Plaintiff's wrists, elbows, shoulders, ankles. (R. 445.) Dr. Romero also reported that Plaintiff had responded positively to Prednisone. (R. 447.) During Plaintiff's visit, Dr. Romero drafted a letter to Plaintiff's employer stating that Plaintiff's lupus "can sometimes flare and cause diffuse joint pains, fever, and malaise," and that she needs to "be monitored every three to six months by the clinic." (R. 447.)

### 3. Dr. Anis Alam

On November 21, 2014, Dr. Anis Alam, completed a medical source statement, summarizing his assessment of Plaintiff's physical well-being. (R. 506–10.) Dr. Alam had treated Plaintiff monthly since November 20, 2013. (R. 506.) Dr. Alam noted that Plaintiff had lupus and was "asymptomatic" and indicated that Plaintiff was on two prescription drugs for lupus. (R. 506–07.) Dr. Amal also reported that based on Plaintiff's general appearance, she was not in acute distress. (R. 508.) He noted that Plaintiff's hand joints were swollen. (R. 508.) With respect to Plaintiff's physical limitations, Dr. Amal reported that Plaintiff could not lift more than twenty pounds, stand or walk more than two hours a day, and sit more than six hours a day. (R. 509.) Dr. Alam also reported that Plaintiff could not push heavy boxes and was limited in her upper extremities. (R. 509.)

8

On December 8, 2014, a state agency employee (the "state agency employee")[4] contacted Dr. Alam to inquire about the inconsistency between Dr. Alam's finding that Plaintiff was "asymptomatic" but also severely restricted in standing, walking, pushing, and pulling. (R. 242.) The state agency employee noted that Dr. Alam "saw [Plaintiff] walking across [the] street prior to last exam and observed that she had a normal gait and no other physical problems. However, when she presented in [the] exam room she could not walk[,] stand[,] or do any other physical movements." (R. 242.) Dr. Alam told the state agency employee that when he questioned Plaintiff about the inconsistency, she "became angry and threatened [him]." (R. 242.) Following the confrontation, Dr. Alam decided to document Plaintiff's subjective symptoms on the RFC form, while still providing his medical opinion that Plaintiff was "asymptomatic." (R. 242.)

### 4. Dr. Ammaji Manyam

On November 12, 2014, Dr. Ammaji Manyam, a medical consultant for the Commissioner, saw Plaintiff for a consultative examination. (R. 502–05.) Plaintiff's chief complaint was noted as lupus. (R. 502.) In addition, Plaintiff reported that she suffers from knee, wrist, and finger joint pain in the mornings and that the pain subsides during the day. (R. 502.) Plaintiff reported that her "pain is throbbing in nature, sometimes shooting, and they make her fingers stiff in the morning time." (R. 502.) Plaintiff also stated that when the weather is bad her pain increases. (R. 502.) With the use of the prescribed medication, Plaintiff's pain level has decreased from a level five on a ten-point scale to a level three. (R. 502.)

Plaintiff told Dr. Manyam that she is unable to cook, clean, and do laundry, and she often enlists her children for assistance. (R. 502.) Plaintiff can bathe and dress herself, and she generally watches television for leisure. (R. 502.) Dr. Manyam reported that Plaintiff did not

---

[4] The employee's full name is not included in the record. On the report of contact, the employee's name is indicated as F. Osorio. (R. 242.)

appear to be in acute distress and that her gait was normal.  (R. 502.)  Dr. Manyam also reported

that Plaintiff could walk on her heels and toes without difficulty, that her squat was at a level two

out of a three-point scale, that her stance was normal, and that Plaintiff used no assistive devices.

(R. 503.)

Dr. Manyam's musculoskeletal examination showed full flexion, extension, lateral

flexion bilaterally, and full rotary movement.  (R. 504.)  An examination of Plaintiff's

extremities revealed no signs of inflammation, swelling, or tenderness in the wrist joints and no

stiffness of Plaintiff's fingers.  (R. 504.)  Dr. Manyam noted that Plaintiff had complete bilateral

grip strength and did not have any "limitations to physical activities of prolonged standing,

sitting, climbing stairs, pushing, pulling, lifting, and carrying weights."  (R. 504–05.)

### 5. Dr. Ezra Sharon

On May 19, 2015, Plaintiff sought treatment from Dr. Ezra Sharon, a rheumatologist to

whom Plaintiff was referred.  (R. 515, 647.)  Plaintiff reported to Dr. Sharon that she had a

headache for one day and had body aches and swollen hands for three days.  (R. 647.)  Dr.

Sharon recommended a follow-up appointment in one week, but Plaintiff declined and stated that

she wanted to call to schedule her appointment.  (R. 647.)  On October 28, 2015, Plaintiff

returned to Dr. Sharon with severe pain in her right leg and under her foot.  (R. 639.)  On

February 29, 2016, Plaintiff saw Dr. Sharon with complaints of a headache and leg pain.  (R.

627.)  Dr. Sharon included a stamp on his notes: "[p]atient is noncompliant and assumes risk of

death."  (R. 627.)

X-rays of Plaintiff's right knee and foot in May of 2016 were unremarkable.  (R. 618–

19.)  On May 25, 2016, Dr. Sharon noted that Plaintiff had reported "pain in the joints," and had

been taking Plaquenil for two years.  (R. 515.)  Dr. Sharon's examination revealed that Plaintiff

has severe alopecia and "tenderness of the lateral aspect of the right elbow."  (R. 515.)  During

an appointment with Dr. Sharon on June 29, 2016, Plaintiff reported that every morning when she wakes up she has fifteen to twenty minutes of stiffness. (R. 514.) She also indicated that she has a cold sensitivity. (R. 514.) Dr. Sharon noted that Plaintiffs MCPs and PIPs were tender and that her shoulder abduction was mildly restricted. (R. 514.) Plaintiff also had weakness in her arms. (R. 514.) Dr. Sharon reported that Plaintiff was "doing well this summer," and that Plaintiff had no swelling in the joints of her hands, shoulders, knees, or neck. (R. 514.) Dr. Sharon continued to prescribe Plaquenil. (R. 514.)

During a follow-up visit on October 1, 2016, Dr. Sharon treated Plaintiff for elbow tendinitis and lupus. (R. 513.) Dr. Sharon administered an injection and advised Plaintiff to avoid lifting and pushing. (R. 513.) On October 29, 2016, Dr. Sharon noted that Plaintiff's elbow tendinitis was "much improved" after the injection he administered earlier that month. (R. 513.) Dr. Sharon also wrote a note indicating that he had been treating Plaintiff for a year and due to Plaintiff's medical condition, she was "unable to work until further notice." (R. 803.)

### ii. Mental impairments

#### 1. New York Psychotherapy and Counseling Center

From May 20, 2015 to November 1, 2016, Plaintiff received treatment at the New York Psychotherapy and Counseling Center. (R. 524–613.) During Plaintiff's first visit on May 20, 2015, she "display[ed] depressive [signs] as evidenced by lack of sleeping, crying spells, lack of energy, [and] feeling tired." (R. 531.) Plaintiff also displayed signs of anxiety and reported that she sometimes overeats when she is anxious and also reported having had a few panic attacks in the past. (R 531.) Plaintiff reported feeling lonely and stated that she has few friends and generally isolates herself from others. (R. 531.)

## 2. Dr. Antoine Adam

On June 24, 2015, Dr. Antoine Adam conducted a psychiatric evaluation of Plaintiff. (R. 548–51, 663–65.) Plaintiff described her mood as "sad and anxious." (R. 549.) Dr. Adam reported that Plaintiff was cooperative, had clear speech, good immediate and recent recall, and fair concentration and focus. (R. 549.) Dr. Adam assessed Plaintiff's condition as major depressive disorder, moderate, and anxiety NOS. (R. 550.) Dr. Adam prescribed Celexa and Seroquel and recommended that Plaintiff maintain monthly medication management and attend psychotherapy treatment. (R. 551, 611–13.) In July of 2015, Plaintiff met with Dr. Adam for medication management and reported that all her symptoms were controlled by medication and that she had no side effects. (R. 671.) Dr. Adam noted that Plaintiff had no changes in sleep, appetite, mood, stressors, or symptoms. (R. 671.) Plaintiff consistently relayed that her symptoms were adequately controlled during monthly appointments with Dr. Adam in 2015 and 2016. (R. 680, 688, 698, 709, 717, 724, 747, 762, 789.) On October 14, 2016, Plaintiff's last psychiatric appointment of record, Dr. Adam reported that Plaintiff was in full compliance with all prescribed medications. (R. 797.) He also noted that Plaintiff reported that all of her symptoms were adequately controlled by the medications she was prescribed. (R. 797.)

On November 22, 2016, in lieu of a medical source statement, Dr. Adam wrote a letter summarizing his observations of Plaintiff's condition. (R. 802.) He wrote that Plaintiff "is currently diagnosed with Major Depressive Disorder Single Episode Moderate and Unspecified Anxiety Disorder." (R. 802.) Dr. Adam also reported that despite Plaintiff's ongoing treatment, she continued "to struggle with persistent depression, hopelessness, lethargy, social withdrawal and anxiety," as a result of her lupus diagnosis and that her "symptoms are chronic, and it is unclear when they will resolve." (R. 802.) Dr. Adam opined that Plaintiff's reported medical

issues and current "depressive and anxiety symptoms will likely impede her ability to travel to and attend work on a consistent basis." (R. 802.)

### 3. Dr. Juliana Trujillo

In July of 2015, Plaintiff sought therapy from Dr. Juliana Trujillo, a cognitive analytic therapist. (R. 666–70.) Dr. Trujillo noted that Plaintiff did not present with any new problems and that Plaintiff did not report any stressors. (R. 666.) Dr. Trujillo also noted that Plaintiff "struggled with staying focused," and during the session, Plaintiff frequently looked at the floor or looked away "as if feeling sad or overwhelmed." (R. 666.) Plaintiff told Dr. Trujillo that she was able to take three walks during the week of July 20, 2015. (R. 676.)

On August 1, 2015, Plaintiff reported feeling calm, peaceful, and nice while painting and listening to mediation music with Dr. Trujillo during a therapy session. (R. 676.) During a session on September 15, 2015, Plaintiff expressed an interest in attending local baking classes and compiling a list of her favorite recipes. (R. 687.) On November 25, 2015, Plaintiff reported to Dr. Trujillo that she had attended a baking class at her church over the weekend and was happy to attend the class because she generally isolates herself and has depressive feelings. (R. 711–12.) On February 9, 2016, Plaintiff explained that being in large crowds triggers her anxiety and that she prefers to "rest quietly." (R. 730.) On February 17, 2016, Plaintiff reported that she had been looking for part-time or volunteer work and struggled to feel motivated. (R. 734.) On July 6, 2016, Dr. Trujillo noted that Plaintiff would be in Puerto Rico on vacation until July 12, 2016. (R. 767.)

### 4. Rafaela Cosme

On August 11, 2016, Plaintiff was reassigned to Rafaela Cosme, a mental health counselor. (R. 777.) When Plaintiff returned from Puerto Rico, she told Cosme that she had a wonderful time on vacation. (R. 779.) During a session with Cosme on September 1, 2016,

Plaintiff told Cosme that she had started going to the gym with a friend in the morning and walking outside for exercise. (R. 786.) Plaintiff also reported that she felt "relaxed" because her children were back in school. (R. 792.) Plaintiff attended two therapy sessions with Cosme in October of 2016. (R. 794–95.)

### c.  The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the SSA. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 30, 2014, the alleged onset date of her disability. (R. 19.) Although Plaintiff had worked after her alleged disability onset date, the ALJ found that "this work activity did not rise to the level of substantial gainful activity."[5] (R. 20.) Second, the ALJ found that Plaintiff had severe impairments of "lupus, depression, and anxiety." (R. 20.) The ALJ declined to find that Plaintiff's elbow tendonitis was a severe impairment because Dr. Sharon reported on October 29, 2016, that Plaintiff's "right elbow tendonitis had much improved after injection," and Plaintiff did not report any further complications nor seek any further treatment for her elbow. (R. 20.) Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or was equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 20–22.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, which involves "sit[ting] for six hours in an eight-hour workday, stand[ing] and or walk[ing] for six hours in an eight-hour workday." (R. 22.) The ALJ found that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently. (R. 22.) In addition,

---

[5]  The ALJ noted that Plaintiff testified that in 2015, she worked "as a waitress part-time, 32 hours, three days a week and was paid $150.00 for three days, plus tips equaling $20.00 per day." (R. 20.)

the ALJ found that Plaintiff could "occasionally climb, balance, and stoop," but could never climb ladders and scaffolds, or kneel, crouch, and crawl.  (R. 22.)  With respect to Plaintiff's mental impairments, the ALJ "limit[ed] [Plaintiff] to work in a low stress environment defined as occasional judgment, occasional decision-making and occasional changes in work setting."  (R. 22.)  The ALJ found that Plaintiff had the RFC to perform "simple, routine and repetitive tasks," with "occasional interaction with supervisors, co-workers and the public."  (R. 22.)

In determining Plaintiff's RFC finding, the ALJ reviewed objective medical evidence and opinion evidence in the record.  (R. 22.)  The ALJ relied on treatment notes from Plaintiff's psychotherapy sessions that documented Plaintiff's social activities, including, going on vacation, looking for part-time or volunteer work, going to the gym, and walking for exercise. (R. 28.)  The ALJ noted that with respect to Plaintiff's physical and mental health, "other than medication, [Plaintiff] received conservative treatment only."  (R. 28.)  In addition, the ALJ noted that during the majority of Plaintiff's psychiatric sessions, she reported that she was in full compliance with her medication regime and that her symptoms were adequately controlled.  (R. 28.)

The ALJ assigned little weight to the opinion of the internal medicine consultative examiner Dr. Manyam, who reported that Plaintiff had no limitations to physical activities with respect to standing, sitting, climbing stairs, pushing, pulling, lifting, and carrying weights.  (R. 29.)  The ALJ found Dr. Manyam's opinion to be inconsistent with the record and not supported by relevant evidence, including Plaintiff's report to Dr. Manyam that she was "unable to engage in all . . . household chores," and that "her children assisted with chores."  (R. 25, 29.)  In

assigning little weight to this opinion, the ALJ found that Plaintiff did have some limitations and assigned Plaintiff a restrictive RFC for light work with some postural limitations. (R. 22.)

The ALJ also gave little weight to the opinion of Plaintiff's treating physician, Dr. Ezra Sharon, who reported that the Plaintiff was unable to work until further notice.[6] (R. 29.) The ALJ found Dr. Sharon's opinion deficient because he "did not give a function-by-function analysis of . . . Plaintiff's physical limitations" and "his opinion [was] inconsistent with the record as a whole, and [] inconsistent with [Plaintiff's] admitted activities of daily living . . . and not supported with relevant evidence." (R. 29.) In addition, the ALJ discounted Dr. Sharon's opinion "that [Plaintiff] is unable to work . . . ," because the determination of whether a claimant can work "is an issue reserved to the Commissioner." (R. 29.)

The ALJ gave partial weight to the opinion of Plaintiff's treating physician, Dr. Alam, who reported that Plaintiff was able to lift and carry twenty pounds, stand and walk for less than two hours and sit for less than six hours of an eight-hour workday. (R. 29.) The ALJ assigned significant weight to Dr. Alam's opinion on "the amount of weight the [Plaintiff] is able to lift," and discounted Dr. Alam's assessment on Plaintiff's "ability to stand/walk," because it was "inconsistent with [Plaintiff's] reported activities [of] daily living." (R. 29.)

The ALJ also gave little weight to the opinion of Plaintiff's treating psychiatrist Dr. Antoine Adam, who reported that Plaintiff's condition would restrict her from working and traveling. (R.29.) The ALJ gave Dr. Adam's opinion little weight because it was inconsistent with the record as a whole and not supported with relevant evidence, including Plaintiff's "admitted activities of daily living which include childcare and working thirty-two hours per

---

[6] The ALJ wrote that she "gives the opinion of Dr. Erza Alam, treating physician (Exhibit 11F) little weight," (R. 29), however, Exhibit 11F is a letter from Dr. Ezra Sharon, (R. 803). It appears the ALJ referenced Dr. Aniz Alam rather than Dr. Ezra Sharon-.

week, and traveling to Puerto Rico." (R. 29.) The ALJ also noted that Dr. Adam's "opinion that [Plaintiff] is unable [to] work is an issue reserved to the Commissioner." (R. 29.)

The ALJ also determined that, while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's "statements concerning the intensity, persistence and limiting effects" of her symptoms were inconsistent with the "medical evidence and other evidence in the record." (R. 27.)

At step four, the ALJ found that, based on Plaintiff's RFC, Plaintiff could not perform her past relevant work. (R. 30.) At step five, the ALJ found that Plaintiff could perform a significant number of jobs that existed in the national economy. (R. 31.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to

more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

**b.  Availability of benefits**

SSI and DIB are available to individuals who are "disabled" within the meaning of the SSA.[7] To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for

---

[7]  SSI is available to individuals who are either sixty-five years of age or older, blind or disabled, and who meet certain income requirements. 42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202. DIB are available to individuals who became disabled while meeting the insurance status requirements of the SSA. 42 U.S.C. §§ 423(a)(1)(A), 423(c). The only issue before the Court is whether Plaintiff is disabled.

evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described

the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46

(2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential

evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*,

758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine

whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. **Analysis**

#### i. **The ALJ properly weighed the opinion evidence**

The Commissioner argues that the ALJ's conclusion that Plaintiff is not disabled is

supported by, among other things, Dr. Alam's opinion, the treatment notes from Dr. Sharon, and

the treatment notes from Plaintiff's medical management sessions. (Comm'r Mem. 23–30.) The

Commissioner also argues that the ALJ properly rejected the opinions of Plaintiff's treating

physicians. (*Id.*) Although Plaintiff has provided only a short opposition to the Commissioner's

motion, the Court has conducted a careful review to ensure that the ALJ applied the correct legal standards and made a decision supported by substantial evidence in the record.

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative."[8] *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2);[9] *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting

---

[8] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502). A "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902.

[9] On January 18, 2017, the SSA published a final rule that changed the protocol for evaluating medical opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). The "new regulations apply only to claims filed on or after March 27, 2017." *Smith v. Comm'r*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018). Because Plaintiff's claim was filed prior to that date, the Court refers to versions of the regulations that were in effect prior to March 27, 2017. *See White v. Comm'r*, No. 17-CV-4524, 2018 WL 4783974, at *4 (E.D.N.Y. Sept. 30, 2018) ("While the Act was amended effective March 27, 2017, the [c]ourt reviews the ALJ's decision under the earlier regulations because the [p]laintiff's application was filed before the new regulations went into effect." (citation omitted)).

*Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion . . . .").

### 1. The ALJ properly weighed Dr. Sharon's opinion

The ALJ found Dr. Sharon's conclusion that Plaintiff is unable to work (1) "inconsistent with record as a whole," (2) "inconsistent with [Plaintiff's] admitted activities of daily living," and (3) "not supported with relevant evidence." (R. 29.) The ALJ's decision to assign little weight to Dr. Sharon's opinion is supported by the record.

As an initial matter, Dr. Sharon's conclusion that Plaintiff is unable to work is a finding reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *see also Martin v. Astrue*, 337 F. App'x 87, 89 (2d Cir. 2009) ("[T]he final responsibilities for deciding issues relating to disability is reserved to the Commissioner," not to physicians); *Snell*, 177 F.3d at 133 (stating that findings that "a claimant is disabled and cannot work . . . are reserved to the Commissioner," and a treating physician's opinion on these points are not afforded controlling weight).

### A. Dr. Sharon's opinion is inconsistent with his own treatment notes

The ALJ did not err in declining to give controlling weight to Dr. Sharon's opinion because Dr. Sharon's opinion was inconsistent with his own treatment notes that suggest Plaintiff's condition was improving with treatment.[10] *See Williams v. Colvin*, No. 16-CV-2293, 2017 WL 3701480, at *6 (E.D.N.Y. Aug. 25, 2017) (affirming the ALJ's decision not to give a treating physician opinion controlling weight because the treating physician "gave assessments of the [p]laintiff's physical abilities that were conflicting"); *Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (holding that the ALJ did not err in declining to give controlling weight to treating physician opinion that was "inconsistent with his own prior opinions and the findings of the other medical examiners, and was based on [the plaintiff's] subjective complaints").

Dr. Sharon's treatment notes from May 19, 2015, a year after Plaintiff's onset date, to

---

[10] The Court finds that the ALJ correctly assigned limited weight to the opinion of Dr. Ammaji Manyam, the consultative examiner, because his opinion was inconsistent with the record and not supported by relevant evidence. In light of this fact, to the extent that Dr. Sharon's opinion is inconsistent with the opinion of Dr. Manyam, the Court finds that any inconsistency has no bearing on the Court's analysis.

October 29, 2016, approximately one month before Plaintiff's hearing, indicate that while Plaintiff complained of symptoms associated with lupus, including tendinitis of the elbow, and pain in her legs, elbow, and arms, (R. 513, 514, 625, 627), her condition was improving with treatment, (R. 513–14). For example, on July 28, 2016, Dr. Sharon's exam revealed no swelling or limitations of joints of hands, shoulders, knees, or neck. (R. 514.) During this examination, Dr. Sharon also noted that Plaintiff "was doing well this summer" and had "no weakness." (R. 514.) Further, just a month before Plaintiff's hearing, on October 29, 2016, Dr. Sharon noted that Plaintiff's elbow tendinitis condition "ha[d] much improved after inj[ection]." (R. 513.)

## B. Dr. Sharon's opinion is inconsistent with Plaintiff's admitted activities of daily living

Dr. Sharon's opinion with respect to Plaintiff's ability to work is also not supported by Plaintiff's admitted activities of daily living. For example, in February of 2016, almost two years after Plaintiff's disability onset date, Plaintiff reported to her psychiatrist, Dr. Trujillo, that she was looking for a part-time job or volunteer work. (R. 734.) Plaintiff's admission to Dr. Trujillo, specifically that she was looking for part-time or volunteer work, suggests that she was looking for work because she was capable of working, which is inconsistent with Dr. Sharon's conclusion that Plaintiff is unable to work. In addition, Plaintiff testified that she worked up to thirty-two hours a week as a waitress for almost the entire period she sought treatment from Dr. Sharon, which is also inconsistent with his conclusion.[11] (R. 55–56.) *See Paratore v. Comm'r of Soc. Sec. Admin.*, No. 05-CV-1356, 2008 WL 541156, at *8 (N.D.N.Y. Feb. 25, 2008) (affirming the ALJ's denial of benefits because the plaintiff reported looking for work throughout the

---

[11] Plaintiff testified that she worked as a waitress from approximately July of 2015 to July of 2016, four months before her hearing. (R. 55–56.) Plaintiff first sought treatment from Dr. Sharon on May 19, 2015, (R. 515, 647), and Dr. Sharon provided his opinion on Plaintiff's ability to work on October 29, 2016, (R. 803).

application and the appeals process, which was inconsistent with complaints of a disabling condition).

Further, during a session with Rafaela Cosme, Plaintiff's mental health counselor, on September 1, 2016, a month before Dr. Sharon concluded Plaintiff could not work, Plaintiff stated that she had been going to the gym with a friend and walking outside for exercise. (R. 786.) Plaintiff also traveled to Puerto Rico on vacation in July of 2016. (R. 767.) The ALJ properly found that Dr. Sharon's conclusion was inconsistent with these activities, as exercising at a gym or going on a vacation do not support Dr. Sharon's conclusion that Plaintiff is completely restricted from working. *See Donaldson v. Berryhill*, No. 17-CV-2000, 2018 WL 4845740, at \*10 (E.D.N.Y. Oct. 4, 2018) (finding that the ALJ properly relied in part on plaintiff's daily activities, including taking several vacations, when determining whether the plaintiff was disabled).

### C.   Dr. Sharon's opinion is not otherwise supported by relevant evidence

In addition to being inconsistent with his treatment notes and Plaintiff's admitted activities of daily living, Dr. Sharon's opinion is also not supported by other relevant evidence in the record, including the opinion of Dr. Anis Alam, Plaintiff's other treating physician. Dr. Sharon's opinion is further based largely on Plaintiff's subjective statements.

In November of 2014, Dr. Alam found Plaintiff to be "asymptomatic," (R. 506), and noted that Plaintiff's lupus was controlled with medication, (R. 507). When contacted by the state agency employee, Dr. Alam also indicated that he observed that Plaintiff had a normal gait and no other physical problems, (R. 242), that would preclude her from working. Although Dr.

Alam made his determination about Plaintiff's ability to work prior to Dr. Sharon's opinion,[12] Dr. Alam assessed Plaintiff's ability to work shortly after her hospitalizations for lupus in July of 2014, the period in which Plaintiff testified that she was too sick to work, (R. 73).

In addition, many of Dr. Sharon's notes regarding Plaintiff's condition appear to be largely based on Plaintiff's subjective statements and not supported by substantial evidence in the record. Dr. Sharon's letter suggesting that Plaintiff's ability to work would be greatly impacted by her condition appears to be largely based upon Plaintiff's complaints and not his actual observations. Although Plaintiff complained that her arm felt weak on July 2, 2016, Dr. Sharon noted that there was no swelling or limitations of Plaintiff's joints, hands, or shoulders, knees, or neck. (R. 514.) He also noted that Plaintiff had "no weakness." (R. 514.)

In addition, although Plaintiff repeatedly complained of severe pain in her right leg and foot, (R. 639, 627), results from a right knee and right foot X-ray conducted on May 5, 2016 were unremarkable. (R. 618–19). Where a treating physician's opinion is not supported by objective medical evidence and is solely based on a plaintiff's subjective complaints, the ALJ is not required to give controlling weight to the physician's opinion. *See Lewis*, 548 F. App'x at 678 (holding that the ALJ did not err in declining to give controlling weight to the treating physician opinion where the treating physician's opinion was unsupported by the objective medical evidence in the record and "was based on [plaintiff's] subjective complaints"); *see also*

_____

[12] Dr. Alam opined on Plaintiff's ability to work two years prior to the opinion of Dr. Sharon, thus in some respect, the Court finds that a comparison of the opinions of Dr. Alam and Dr. Sharon is of limited evidentiary value, given the lapse of time between their treatment of Plaintiff. However, although Dr. Alam made his determination about Plaintiff's ability to work prior to Dr. Sharon's opinion, Dr. Alam assessed Plaintiff's ability to work shortly after her hospitalizations for lupus in July of 2014, the period in which Plaintiff testified that she was too sick to work. (R. 73.) Therefore, the Court finds it somewhat useful to compare Dr. Alam's observations during this time period immediately after Plaintiff's hospitalizations, with Dr. Sharon's observations of Plaintiff during a time period where Plaintiff was not hospitalized and was able to work.

*Roma v. Astrue*, 468 F. App'x 16 (2d Cir. 2012) (affirming an ALJ's decision to give little weight to a treating physician because the treating physician's opinion was primarily based on Plaintiff's subjective responses and inconsistent with the record as a whole); 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

In sum, the ALJ correctly assigned limited weight to Dr. Sharon's opinion that Plaintiff would be unable to work, because Dr. Sharon's opinion was inconsistent with his treatment notes, inconsistent with Plaintiff's admitted activities of daily living, and not otherwise supported by relevant evidence in the record.

### 2. The ALJ properly weighed Dr. Alam's opinion

In affording "partial weight" to Dr. Alam, one of Plaintiff's treating physicians, the ALJ found that Dr. Alam's opinion with respect to Plaintiff's ability to lift was consistent with evidence in the record, but found that Dr. Alam's opinion on Plaintiff's ability to stand and walk was inconsistent with the evidence in the record. (R. 29.) The Court finds that the ALJ properly assigned partial weight to Dr. Alam's opinion.

Dr. Alam opined that Plaintiff was able to lift and carry twenty pounds, stand and walk for less than two hours out of an eight-hour workday, and sit for less than six hours out of an eight-hour workday. (R. 509.)

In determining Plaintiff's ability to lift, the ALJ found Dr. Alam's opinion, that Plaintiff is restricted in her ability to lift, credible. (R. 29.) Relying on Dr. Alam's opinion, the ALJ determined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently. (R. 22.) Dr. Alam's opinion about Plaintiff's lifting is supported by treatment notes from Dr. Sharon that document Plaintiff's mild restriction in her shoulder abduction. (R. 514.) Although Plaintiff testified that she is only sometimes able to lift a quart of milk, (R. 78), the

ALJ was not required to accept Plaintiff's testimony given the discrepancies between treatment notes in the record and Plaintiff's testimony, including that she worked as a house cleaner while allegedly disabled, a position classified at the heavy exertional level. (R. 65–66.)

The ALJ properly assigned limited weight to Dr. Alam's opinion that Plaintiff could only walk or stand for less than two hours a day, because his opinion is inconsistent with evidence in the record. On September 1, 2016, Plaintiff reported to Rafaela Cosme, her mental health counselor, that she had started to go to the gym with a friend and exercised outdoors by walking. (R. 786.) Plaintiff also testified that she either walks or takes public transportation. (R. 53.) While Plaintiff's daily activities are not by themselves substantial enough evidence to entirely discount Dr. Alam's opinion, Plaintiff also testified that she worked as a waitress for a year ending only four months before the hearing, (R. 55), where she waited tables, (R. 19), a task that requires walking and standing. *See Michelson v. Colvin*, No. 15-CV-0650, 2017 WL 4402455, at *11 (E.D.N.Y. Sept. 30, 2017) (stating that a [p]laintiff's daily activities are a relevant factor to be considered); *see also Nusraty v. Colvin*, 213 F. Supp. 3d 425, 440 (E.D.N.Y. 2016) (observing that the "[p]laintiff's reports of her daily activities by themselves are not substantial evidence that she was not disabled and are insufficient to justify according [the treating physician's] opinion limited weight" (first citing *Balsamo v. Chater*, 142 F.3d 75, 81–82 (2d Cir. 1998); and then citing *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014))). As a waitress, Plaintiff would work up to thirty-two hours per week. (R. 55–56.) Furthermore, Plaintiff's chief complaints with respect to her job as a waitress were not related to standing or walking, but to her ability to hold plates, cut food, and conduct other tasks involving her hands. (R. 69.)

Although Dr. Alam reported that Plaintiff was severely limited in her ability to stand and walk, during a follow-up communication with the state agency employee, Dr. Alam stated that he saw Plaintiff walking across the street prior to the exam and observed that Plaintiff had a

27

normal gait and had no other physical problems.  (R. 242.)  Dr. Alam reported that shortly

thereafter, during his examination of Plaintiff, she was unable to walk, stand, or make any other

physical movements.  (R. 242.)  When he questioned Plaintiff about the limitations he observed

during the examination compared to the lack of limitation he observed prior to the examination,

Plaintiff became angry and threatened him.  (R. 242.)  As a result, he chose to document

Plaintiff's subjective allegations on the RFC section of his medical source statement and to note

his observations under the notes section of his statement.  (R. 242.)  Given Dr. Alam's admission

and the inconsistency between his observations of Plaintiff before and during his examination,

the Court finds that the ALJ properly rejected Dr. Alam's opinion on Plaintiff's standing and

walking limitations.  *See Hilliker v. Berryhill*, No. 16-CV-00827, 2017 WL 4220529, at *8 (D.

Or. Sept. 21, 2017) (affirming the ALJ's decision to assign limited weight to a treating

physician's opinion that was based on a plaintiff's subjective complaints because the plaintiff

was dishonest and manipulated her health providers).

### 3.    The ALJ properly weighed Dr. Adam's opinion

The ALJ also assigned little weight to the opinion of Dr. Antoine Adam, Plaintiff's

treating psychiatrist, because his opinion as to Plaintiff's ability to travel and work was

"inconsistent with the record as a whole and inconsistent with the [Plaintiff's] reported activities

of daily living, including working as a waitress [thirty-two] hour[s] per week, and traveling to

Puerto Rico."  (R. 29.)

 In lieu of a medical source statement, Dr. Adam submitted a letter indicating that

Plaintiff's "medical issues and current depressive and anxiety symptoms will likely impede her

ability to travel to and attend work on a consistent basis."  (R. 802.)  This letter was written

approximately one month after Plaintiff reported to Cosme that "she went to Puerto Rico with

her children," and had a "great time with family and friends," (R. 779), and a few months after

Plaintiff stopped working as a waitress, (R. 69).

Dr. Adam's opinion is also undermined by his own treatment notes. There are no treatment notes from Dr. Adam indicating that Plaintiff struggled with her sleep or appetite. Throughout Plaintiff's treatment with Dr. Adam, she consistently reported that her symptoms were adequately controlled by her medication, (R. 680, 688, 698, 709, 717, 724, 747, 762, 789), and on October 14, 2016, approximately one month before Dr. Adam submitted his letter to the ALJ, Dr. Adam noted that Plaintiff had no changes in sleep, appetite, mood, stressors, or symptoms, (R. 671).

Dr. Adam's letter in support of Plaintiff's application is also undermined by other medical evidence in the record. In his letter to the ALJ, Dr. Adam states that Plaintiff often "reports feeling unable to leave her home due to chronic physical pain and fatigue . . . which in turn triggers feelings of depression," (R. 802), but Plaintiff's more recent treatment notes from Plaintiff's psychotherapy sessions indicate that Plaintiff was engaging in social hobbies, (R. 586), her anxiety and depression had decreased, (R. 770), and she had started going to the gym to exercise with a friend, and started walking as a form of exercise, (R. 776). The description of Plaintiff's self-reported social activities, recorded during her weekly psychotherapy sessions, significantly undermine Dr. Adam's opinion that Plaintiff's symptoms would impede her ability to travel and work. *See Decrese v. Colvin*, No. 14-CV-1392, 2015 WL 5918316, at *3 (N.D.N.Y. Oct. 9, 2015) (affirming an ALJ's decision to give the opinion of plaintiff's treating physician limited weight because the physician's opinion was not supported by substantial evidence and the record reflected that plaintiff's condition was controlled by medication and that the plaintiff was asymptomatic and stable).

In addition, the ALJ appropriately assigned Dr. Adam's opinion about Plaintiff's physical condition limited weight given Dr. Adam's specialty as a psychiatrist. The Social

Security Regulations instruct ALJs to take treating physicians' areas of specialization into account when determining how heavily to weigh their opinions. 20 C.F.R. § 404.1527(c)(1). Because Dr. Adam is a psychiatrist, the ALJ was not required to give significant weight to his opinion about how lupus would physically impact her ability to work. *See Mercado v. Berryhill*, No. 16-CV-6087, 2017 WL 3328177, at *14 (S.D.N.Y. Aug. 3, 2017) (finding that the ALJ properly concluded that a podiatrist's opinion on plaintiff's neck, back, and knee should be given little weight).

Furthermore, as discussed *supra*, the determination of a plaintiff's disability status is reserved for the Commissioner. Because Dr. Adam's opinion was not supported by substantial evidence in the record and was inconsistent with his own treatment notes, the Court finds that the ALJ assigned the appropriate weight to Dr. Adam's opinion.

### 4. The ALJ did not err in her credibility assessment of Plaintiff

In making her determination that Plaintiff was not disabled, the ALJ gave Plaintiff's testimony limited weight. The ALJ determined that, while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's "statements concerning the intensity, persistence and limiting effects," of her symptoms were inconsistent with the "medical evidence and other evidence in the record." (R. 27.)

"Importantly, it is the function of the Commissioner, not the reviewing court, to appraise the credibility of witnesses, including the claimant." *Rusin v. Berryhill*, 726 F. App'x 837, 840 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

Based on a review of the record, the Court declines to disturb the ALJ's credibility determination, as it is supported by substantial evidence in the record. *See Genier*, 606 F.3d at 49 ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of

pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (internal citations omitted)).

Plaintiff testified that she is unable to consistently lift a quart of milk, that she is only able to walk a block until she must stop, and that she is only able to stand for ten minutes and sit for thirty minutes. (R. 23.) Plaintiff's testimony regarding her physical conditions is inconsistent with treatment notes from her psychotherapist sessions that document Plaintiff's reports that she was exercising and going on walks with friends in the morning. (R. 786.) Even after Plaintiff's discharge from her hospitalizations in 2014, discharge notes from Plaintiff's hospitalization at Bellevue from September 6, 2014 indicate that Plaintiff was able to walk independently and without pain. (R. 355.) In addition, Plaintiff's testimony that her pain was "stronger" at the time of the hearing, (R. 73), is inconsistent with her reports to various treating sources that her condition was improving, (R. 523, 513–14).

The ALJ also gave little weight to Plaintiff's post-hearing statement, where Plaintiff attempted to suggest that she did not work as many hours as she testified to at the hearing. (R. 29.) The ALJ found that the "record reflects that [Plaintiff] understood the questions posed and her answers were clear," and that Plaintiff's testimony and statement "reflect that she worked multiple hours on multiple days." (R. 29.) The Court finds that the ALJ's finding as to Plaintiff's post-hearing statement is supported by the record, which reflects that the ALJ questioned Plaintiff about her work hours twice during the hearing, (R. 55, 59–60), and also left the courtroom to give Plaintiff's attorney an opportunity to explain the question and obtain an accurate and honest response as to Plaintiff's work history, (R. 56).

The record therefore supports the ALJ's determination that Plaintiff's claims were not entirely credible. Accordingly, the Court finds that the ALJ's analysis of the record and decision

31

as to Plaintiff's credibility was based on substantial evidence.

### 5. The ALJ's RFC determination is supported by substantial evidence

The ALJ's conclusion that Plaintiff is physically capable of performing light work is supported by substantial evidence in the record. Although this determination is not consistent with the opinions of two of Plaintiff's treating physicians or Plaintiff's subjective reports of pain, the Court finds that the ALJ's opinion is consistent with treatment notes from Plaintiff's treating physicians and objective evidence in the record.

Treatment notes from Plaintiff's treating physician, Dr. Sharon, which begin shortly after Plaintiff's onset date and cover the entire relevant period of Plaintiff's alleged disability, indicate that while Plaintiff encountered stiffness and occasional joint pain, (R. 514, 502, 639, 647), Plaintiff was generally asymptomatic, and her lupus was controlled by medication, (R. 506–07, 513–14).

In addition, the record does not support a claim that Plaintiff's mental well-being would impact her ability to work. For example, Plaintiff consistently reported to her psychiatrist that her symptoms were adequately controlled by her medication with no side effects. (R. 680, 688, 698, 709, 717, 724, 73, 747, 762, 789.) Moreover, during Plaintiff's psychotherapy sessions, she reported that her depression and anxiety had decreased, (R. 770), and that she was making progress and engaging in social hobbies at a higher frequency, (R. 586–87). Plaintiff even testified at the hearing that she was taking medication which was helping her "calm down." (R. 76.)

The ALJ's conclusion that Plaintiff is capable of performing light work is also supported by Plaintiff's reported work history. While Plaintiff was diagnosed with lupus, elbow tendonitis, anxiety, and depressive disorder, objective evidence in the record does not support a conclusion

that these impairments preclude Plaintiff from light work.  For example, although the medical

evidence in the record indicates that Plaintiff was diagnosed with lupus in 2014, Plaintiff was

nevertheless able to work as a waitress for a year in 2015, a job classified as light exertional

work, semiskilled with an SVP of three.  (R. 84.)  In addition, Plaintiff testified that she has

"always worked," (R. 71), and worked as a house cleaner before her waitress job, a position

classified as heavy unskilled work with an SVP of 2.  (R. 71–72.)  *See Allen v. Comm'r of Soc.*

*Sec.*, No. 514-CV-1576, 2016 WL 996381, at *8 (N.D.N.Y. Feb. 22, 2016) ("[C]onsideration of

part-time employment is appropriate, even where it would not qualify as substantial gainful

activity, because it may show the type of work that a plaintiff can perform."); *see also* 20 C.F.R.

§§ 404.157, 416.971 (stating that even though part-time work does not constitute substantial

gainful activity, it may show the type of work that plaintiff is able to do).

Based on a review of the record, the Court finds that the ALJ's conclusion that Plaintiff is

not disabled as defined in the SSA, is supported by substantial evidence.

## III.  Conclusion

For the foregoing reasons, the Court grants the Commissioner's motion for judgment on

the pleadings.  The Clerk of Court is respectfully requested to enter judgment and close this case.

Dated: March 27, 2019
     Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge
